1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3     BEFORE THE HONORABLE MAGISTRATE JUDGE LAUREL BEELER

4  ------------------------------)
                                 )
5  In Re:                        )
                                 )
6  Hulu Privacy Litigation       )     No. C 11-3764 (LB)
                                 )
7                                )     San Francisco, California
                                 )     Thursday, June 7, 2012
8  ------------------------------)        (25 pages)

9

10

11

12                    TRANSCRIPT OF PROCEEDINGS

13  APPEARANCES:

14  For Plaintiff:        KamberLaw, LLC
                          100 Wall Street
15                        23rd Floor
                          New York, New York 10005
16                  BY:   SCOTT A. KAMBER
                          GRACE E. TERSIGNI
17
    For Defendant:        O'Melveny & Myers, LLP
18                        Two Embarcadero Center
                          28th Floor
19                        San Francisco, California 94111
                    BY:   RANDALL W. EDWARDS
20

21

22

23

24

25

1  <u>Thursday, June 7, 2012</u>

2                                                    <u>(11:26 a.m.)</u>

3              **(In open court)**

4         THE COURT:  Let's call Hulu next.

5         DEPUTY CLERK:  Calling civil action C 11-3764,

6  In re: Hulu Privacy Litigation.

7         Counsel, please state your appearances for the

8  record.

9         MR. KAMBER:  Scott Kamber of KamberLaw for

10 plaintiffs.

11        THE COURT:  Good morning Mr. Kamber.

12        MR. KANTER:  Good morning.

13        MR. EDWARDS:  Randall Edwards from O'Melveny &

14 Meyers for Hulu.

15        THE COURT:  Good morning.

16        Okay.  So, there are a few different sets of

17 issues I'd kind of like to go through.  I'll tell you my

18 questions on each, and we'll just move through that way

19 rather than my doing it all at once.

20        Let's just start with the claims issue, and

21 the -- so I'll tell you what I'm thinking; then you can

22 tell me what you think is right or wrong about my

23 approach.  I'm interested in what you think was wrong

24 about it.

25        So plaintiff's characterization was something

1    along the lines of -- I've got it excerpted here -- due to

2    the uncertainty in the law, electing at this time not to

3    pursue the other claims.  Here's my view of it.  You know,

4    given the procedural posture of the case, it really is

5    abandonment at this stage of the litigation.  The question

6    is whether the abandonment should be a dismissal with or

7    without prejudice.  And here's my view -- reading Hulu's

8    cases, saying it ought to be with prejudice, here's my

9    reaction -- and those cases where a court dismissed with

10   prejudice tended to be where no one said anything in the

11   papers, and then there was one case before Judge Ware

12   which I think was the Facebook litigation where, on top of

13   that, they said something super-vague like, We want to

14   reserve our rights, and he said it's just not enough.

15          As to the state claims, not the federal claim,

16   not the 1029 or whatever it is, the 1028, 1029 claim, as

17   to the state claims, this case seems different.  It wasn't

18   my job and you guys didn't argue it -- and I'm not saying

19   that critically; I'm saying it descriptively -- of course

20   you didn't -- but litigation sometimes proceeds on

21   different tacks.  Whether or not you can do it is the

22   issue of whatever particular litigation -- sometimes cases

23   proceed in state court; sometimes cases proceed in federal

24   court.  There are real issues about certifying a

25   California class -- or a nationwide class with California

1    claims.  You cited the case that said it.

2            So in my view, the dismissal of the state claims

3    ought to be, for that reason, looking at the case law

4    without prejudice -- I mean, they're probably not going to

5    be here, whatever -- if and when and whether plaintiff's

6    decide to pursue them, there may or may not be issues

7    about whether or not they're allowed to do it.  I just

8    don't think that a dismissal with prejudice is appropriate

9    for those reasons, given one court's dismissal for

10   abandonment.  I mean, you wrote a motion to dismiss.  They

11   read it.  They basically, seeing that, decided to focus on

12   the claim that mattered.

13           The equities aren't there, though, with the

14   federal claim.  That one I think ought to be dismissed

15   with prejudice, for the reasons that Hulu said.  This is

16   your federal litigation; these are your claims.

17           That's my preliminary.  Mostly it goes your way.

18   I think it's hard to disagree with.  The federal claim

19   analysis tell me -- and I mean, I read all those cases

20   just for fun, even though there was sort of a minor issue

21   in the litigation, but tell me if you really think that's

22   a bad approach.  I mean, you narrowed your case way down.

23           MR. EDWARDS:  And I appreciate that, your Honor,

24   and I appreciate that you looked at those cases and I

25   understand that they came up in slightly different

1    context, although I don't think that the distinction

2    makes -- quite the difference that you've indicated so

3    far.  And here's the difference:

4          This is not a certified class at this point.

5    This is a case of six plaintiffs who may at some point try

6    to get a class certified.  So the with prejudice/without

7    prejudice distinction really effects the six named

8    plaintiffs who are here.  Not everyone else.

9          THE COURT:  I agree.

10         MR. EDWARDS:  There might be someone else who

11   might try a claim.  I'd love to tell you I have an

12   argument that their claim should be with prejudice right

13   now, but I can't do that.

14         With respect to the six people who are bringing

15   claims, two things:  One is, I don't think that it's

16   appropriate in the face of a motion to dismiss.  I'd like

17   my motion ruled on.  They didn't oppose it.  They have --

18   you know, a fair argument is they don't have cases that

19   would defeat my arguments.

20         THE COURT:  They definitely didn't state -- they

21   didn't file the statement of nonopposition, which is what

22   the Court's local rules require, when they don't oppose

23   it.  It can't be a voluntary dismissal because you can't

24   dismiss claims.  So what they did is they said something

25   different which is -- I'm not asking you to agree with

1    this, necessarily —— but they said, basically, you're

2    right, we're not going —— we can't go forward in this

3    litigation with these claims.  Okay.  And then basically

4    saying, We'll look at a state proceeding, maybe or maybe

5    not, we might raise them.  That's your risk.

6           And the only issue then is not that you're going

7    to precede with them here.  Because you're not; you can't.

8    Not with the nationwide class; not with the Ninth Circuit

9    case law.  So the only issue is:  Is it going to be ——

10   if —— question mark —— they go back to state court, would

11   this litigation be a bar to them, and I think the answer

12   is that's really not what's before me, given the

13   procedural posture.

14          MR. EDWARDS:  And I understand we don't want to

15   jump too many steps ahead, and I'll just make one last

16   point on this.

17          THE COURT:  Okay.

18          MR. EDWARDS:  I think if they brought the state

19   claim, these same plaintiffs brought the state claim,

20   there's nothing in your ruling for dismissal —— if you

21   ruled to dismiss without prejudice, that would prevent

22   them tomorrow from filing a lawsuit in state court

23   alleging those state claims.  And then, you know, we'd be

24   in a situation where they've split their claims, they're

25   hedging their bets in two courts, and, you know, not to

1    reiterate the point, but to reiterate the point that I

2    laid out a lot of arguments about what's deficient in

3    their pleading, and they just -- they offer nothing to say

4    that they could fix it.

5         THE COURT:  I totally agree.  They ducked the

6    issue by -- and of course, from my perspective, I shall at

7    the end of the day, your -- well, your argument might be,

8    equitably, you picked a forum, you made your claims, you

9    maybe jumped too fast.  If you're trying to certify a

10   nationwide class, you should have maybe realized that

11   earlier.  And that's your argument back:  At the end of

12   the day, I don't think they get -- I hear you.  You're

13   saying they shouldn't get a second bite at the apple in a

14   state forum, even though at the beginning, they put you

15   through your paces of opposing everything in the motion to

16   dismiss.  I mean, I understand the argument.  I understand

17   the argument.

18        MR. KAMBER:  From our perspective, we tried to do

19   the right thing here.  Looking at the situation, looking

20   at the papers, we have an opposition to that.  We've been

21   arguing that.  We were in front of Judge Koh; we've been

22   in front of -- a number of different cases that were cited

23   by the defendants here were actually cases that my firm

24   litigated.  A lot of times the Article III -- like for

25   instance that Judge Koh just ruled that we've now survived

1    the second time through.  What we've been finding on

2    nonstatutory claims, the three aspects have been a

3    tremendous delay in the litigation, and the case law right

4    now is getting a little bit more certain.  But there's a

5    fair degree of uncertainty with it.

6           Our concern in pushing forward at this point in

7    time with the Article III argument is we would

8    necessarily --

9           THE COURT:  This is the standing argument, you

10   mean.

11          MR. KAMBER:  Just generally, that's the way.

12   We're looking at dropping the nonstatutory claims.

13          THE COURT:  We haven't gotten there yet.

14          MR. KAMBER:  But looking at it from a

15   nonstatutory perspective, the case law was clear, so

16   therefore to proceed, and given more case law is coming

17   down -- Mazda had become final during that process -- and

18   we were thinking, Hey, we're delaying this process to

19   litigate a statutory claim, which is really the beef of

20   the claim here, the beef of the client's complaints here

21   is all about VPPA.  And to us it seemed to make sense; it

22   seemed to not waste the resources of the court.

23          I think to have it be kind of punitive -- I

24   understand on the federal claims -- you know, this is our

25   federal action; we didn't bring them.  Fine.  We have no

1    intention of bringing the state claims, you know,

2    simultaneously. But on the other hand, certainly we don't

3    think that the state claims should be dismissed with

4    prejudice.

5         We don't know -- we're fairly confident on the

6    VPPA claim. Hopefully -- you know, that this was

7    hopefully looking at it from a distinct perspective, if --

8    but obviously not looking to get ahead of ourselves,

9    whether or not there is an alternative. But I think it

10   would be a somewhat harsh and punitive measure for us

11   trying to push the case forward efficiently to dismiss the

12   state claims with prejudice at this juncture.

13        THE COURT: Okay. I understand. I would just

14   say, you know, you would narrow your case to what matters

15   if you decided you wanted to say, I'm abandoning them;

16   we're just focusing on this federal litigation, and no

17   other -- I mean, there's some value to just narrowing how

18   you're going to attack the privacy policies that you're

19   going to attack with Hulu. I mean, one of the issues was,

20   as your arguments -- but not your arguments on the with or

21   without prejudice, and it just sort of seemed to me on

22   this record I was uncomfortable reaching that conclusion.

23   So that was part of my issue too. So, okay, I understand

24   the argument.

25        Let's move on to standing. The -- okay.

1  Standing.  Look, let me just summarize what I think your

2  arguments are and what I think I would like to do on

3  standing.  So basically, your view (to Mr. Edwards) is the

4  Supremes could change the lay of the land in the pending

5  case.

6      And especially since one of the big cases you

7  rely on (to Mr. Kamber) for your standing argument is

8  pending.

9      And certainly -- I mean, I didn't listen to the

10  transcript of the oral argument, but I read the SCOTUS

11  blog, and certainly things could change, and it is

12  relevant.

13      So from my perspective, it does make sense to

14  allow -- to wait and see what happens, and to have you all

15  address that when the case comes out.  I think it does

16  make sense.

17      Your argument is you made all these robust

18  arguments about standing, that -- Article III issues (to

19  Mr. Edwards).

20      You responded on a straight-up analysis of,

21  Congress created a statute, we alleged a vital statute;

22  therefore, we've established standing, which the case law

23  supports (to Mr. Kamber).

24      Which you concede now (to Mr. Edwards).

25      And it may change.

1          My view is:  Fine, both of you are right.  Your

2     issue is you ought to be precluded from arguing a more

3     robust standing analysis.

4          I did want to talk a little bit about the motion

5     to dismiss a little today too, because it's interesting,

6     it seemed to me looking at the complaint, the way some of

7     the allegations are -- and I read it really closely, just

8     parenthetically, and this is more about the motion to

9     dismiss -- you defined the class in a certain way.  The

10    allegations about what people did in visiting Hulu are a

11    little bit more robust than just "visited the Hulu

12    website" kind of class definition.  So I was mindful of

13    that.

14         But in the end, it -- and we can talk about it

15    when we get to the motion to dismiss -- there were some

16    arguments, especially if the Supreme Court goes with the

17    sort of small hammer number two approach to evaluating

18    what I'm calling statutory standing.

19         With all that being said, I figured we'd -- you

20    know what, I don't know that we need to talk a lot more

21    about standing now.

22         And then I kind -- and I did want to

23    problem-solve with you.  We'll come back to this at the

24    end, because I want to talk about the motion to dismiss a

25    little bit, because here you are.

1          I had thought that what we would do is set a --

2    and again, if it's too tight, if it's too ambitious or it

3    ends up being too ambitious when the Supreme Court comes

4    up with its decision, I don't have any objection to

5    modifying the deadlines.  I don't want to jam up anybody's

6    summer, but I thought we'd set a briefing schedule that

7    would result in narrow page limits, seven pages/seven

8    pages/three pages, kind of thing, with a briefing schedule

9    that would result in a further argument on August 23rd.

10   You can kind of perk on that.

11          And then, with the seven-page supp brief by Hulu,

12   you cut right to the chase in seven pages.  It's plenty of

13   space.  That would be due July 19.  Response, August 2nd.

14   Optional reply, August 9th.  I just looked at that based

15   on the calendar, but I'm mindful of the fact that it's the

16   summer.

17          I was going to put this in an order I was going

18   to issue today on the standing issue.  It's worth it to

19   lay out -- just so you don't have to repeat it when you

20   come back.  I laid out where we are now.  I said that in

21   the order.  Then I put in that schedule.  If the -- here I

22   am telling it to you today, but I don't have an objection

23   if, after looking at that schedule and going back at

24   looking at your summer calendar, you decide there's a

25   different schedule that makes sense.  So I wanted to say

1   that.

2           So, what do you think generally about that

3   approach?  You're okay with further briefing, obviously.

4           MR. EDWARDS:  I'm okay.  And I think it makes

5   sense, and you know, I certainly in my papers said that

6   they didn't address any of the other standing issues.  I

7   think if you parse through their complaint, they have

8   about four, depending on how you slice and dice it, there

9   are about four theories of harm, some of which I think

10  drop away when the CFAA claim drops away.  Mr. Kamber may

11  have a different view of it.  What I was trying to figure

12  out, what could they have argued if they chose to argue

13  anything beyond the narrow statutory one, and there may be

14  something --

15          THE COURT:  That's what I thought, looking at it.

16  And one of the reasons I thought it was worth kicking out

17  a standing-only order -- I'm not saying they could, I'm

18  just saying I thought they could, and I actually went

19  through the trouble of kind of trying to go through the

20  complaint and lay out what's there, which I incorporated

21  in this order, which could be a motion to dismiss order,

22  because that's kind of what I was thinking.  But also is

23  relevant to the standing analysis.

24          So by kicking out this order laying out where we

25  are, which is a little bit more robust than just kicking

1    it out until the end of August -- you'll see what I

2    said -- and then that will help you -- seven pages could

3    be the outside of your submission.  And you might need to

4    say a whole lot less, because I've said a lot of it

5    already.

6           Okay?

7           MR. EDWARDS:  That generally sounds fine, and at

8    least as far as I can tell right now, the schedule you

9    proposed is workable, from our perspective.

10          THE COURT:  If it doesn't work, you guys figure

11   it out.

12          MR. KAMBER:  The only thing I'd add outstanding

13   from plaintiff's perspective here is the case law thus far

14   with *Edwards* as still the governing law in the Ninth

15   Circuit.  It's fairly straightforward.  It's statutory.

16   We don't need to say much more on it on that record.

17          THE COURT:  That's why I'm going to let you brief

18   the full issues.

19          MR. KAMBER:  Where *Edwards* comes out, our own

20   perspective on it, just looking at it, is RESPA -- you

21   know, in RESPA --

22          THE COURT:  RESPA's a different statute.  I get

23   it.

24          MR. KAMBER:  Dealing with kickbacks for

25   overcharge.  It's all about the money.

```
1              THE COURT:  Also a high limit -- I looked at
2    the -- it's just a different --
3              MR. KAMBER:  Just depends how far will the
4    Supreme Court go.  We don't know that.  Whether we rule
5    it's a motion for reconsideration and we wind up doing the
6    briefing anyways, if Edwards is overturned anyways, I
7    think certainly there winds up being more briefing and
8    this winds up being a very efficient way of doing it.
9              The only thing I would add is, you know, just,
10   you know, this particular statute looks, you know -- in
11   allowing for liquidated damages, I mean, Congress has made
12   the decision that, you know, this type of privacy
13   violation can cause a harm.  And we're talking about a
14   class where the members of the class all had the statutory
15   violation, not -- unlike a situation where you had
16   kickbacks.  Yet the plaintiff in the Edwards case never
17   was overcharged.
18             THE COURT:  Exactly, because Ohio law limited the
19   fees that could be charged.  I understand it's different.
20   But nonetheless, the Edwards decision is going to -- well,
21   it probably will change the lay of the land.  And you --
22   I'm not going to guess what it might be to decide the
23   issue now because that makes zero sense.  So that's why.
24             Okay, I mean, I was mindful of the difference.
25   RESPA is different.  Okay.
```

1          Let's talk a little bit about the -- well, I

2     mean, I'm just going to make some observations about

3     the -- about -- I don't know how much we should really

4     talk about it.  I already told you a little bit, I laid

5     out the allegations in the complaint in the fact section

6     because it is relevant to standing.  It's going to be

7     relevant to the harm you allege when you come back and

8     talk more robustly about what standing means in a post

9     *Edwards* world.  It's also relevant to whether you state a

10    claim.  I mean, sort of when you pull back, and I

11    didn't -- I mean, just considering what it means -- you

12    know, I'm not sure who your class really is.  I mean, I

13    called out the allegations in the complaint, sort of

14    thinking about the subscriber analysis.  Clicking on Hulu

15    to look at content that's there without logging in is

16    different than being, you know, the subscriber that you

17    think about that's named under the statute.  I mean, I

18    think you actually did, you defined the class, but class

19    definitions get defined in a certain way.  You made more

20    specific allegations.

21         Again, you'll see that I've laid them out.  I

22    won't be discussing them in this order, but I'm just

23    naming that -- I mean, it's kind of like, my general view

24    is, on the subscriber issue, there's probably, there seems

25    like there's enough in the complaint, but I just am

1    observing that what actually happened in the case of

2    people visiting a website -- I don't know.  You said one

3    of your folks actually was a paid, you know, Hulu Plus

4    person, and -- but, you know, as alleged, it's not acted

5    that way.  I'm just making the observation.  Privacy is an

6    interesting thing, with -- and I didn't do any kind a

7    robust look; you all didn't do it and that's fine -- on

8    what was actually said in the privacy policy, what was

9    said in the terms of use.  No one seemed to argue about

10   whether they, the Court could consider them.  Certainly

11   the privacy policies were called out in the complaint.

12   The terms of use were attached and actually cited by you,

13   so I didn't see that there was any problem.

14          So, I'm just saying that it's -- the litigation

15   itself is interesting.  And so that's one observation.

16          Just another observation, and again just because

17   you're here, and if you all wanted to talk about any of it

18   that's fine, but I think we probably don't need to.  You

19   know the bricks and mortar issue, I did read all the

20   legislative history, and considered everybody's dictionary

21   definitions.  I think I'm going to have it in my standing

22   order:  OED, Oxford English Dictionary.  But it's hard for

23   me to get to -- so at the end I guess I'm saying that it

24   seemed to me, from a pleading stage, that the -- and the

25   ordinary course of business argument raised interesting

1   arguments on sort of the merits of the case, but we're at

2   the pleading stage, and so it's interesting how -- you

3   mean, you alleged it a certain way the allegations are

4   going to be called out, and even in this version of the

5   order -- but you know we're at the pleading stage, not at

6   a, you know, what-really-happened stage.

7          So I guess I'm just letting you know my takeaways

8   because I did read everything, since you briefed

9   everything, even though we're going to have this supp

10  briefing.  At least lets you know what I'm thinking.

11  Because I didn't know -- and I guess I would give you the

12  opportunity, if you want walk through those things now --

13  I guess we're going to be back here anyway, and the

14  standing argument, and maybe it just makes sense to

15  postpone all of that, but at least you can be thinking

16  those things when you come back and talk to me at the next

17  hearing, assuming we survive standing, to talk about the

18  motion.  You know, the motion to dismiss.

19          MR. KAMBER:  The only thing I would add, from a

20  plaintiff's version, is --

21          THE COURT:  I got the word pleading.

22          MR. KAMBER:  The original complaint, the amended

23  complaint serves a lot of messages.  There's a lot of

24  claims there.  As opposed to focusing on VPPA, which is

25  where we are now.

```
1          THE COURT:  I was very mindful of going through,
2     and I actually looked at what you alleged through VPPA and
3     how those fit in.  So --
4          MR. KAMBER:  The need to satisfy Article III
5     through somewhat -- I don't want to say conflicting, but
6     different judges' takes on Article III on a nonstatutory
7     context in Northern and Central Districts -- you've got
8     pieces of that that kind of go throughout the complaint.
9          I think what's important, from a plaintiff's
10    perspective, when looking at it, if Edwards changes the
11    lay of the land, maybe it would make sense to -- maybe it
12    would make sense for plaintiffs to reserve the right to
13    amend prior to going through the mini briefing process.
14    We're not looking to, you know, change things night to
15    day.  But if Edwards is going through, we may be able to
16    focus, instead of taking up the next three months -- and I
17    guess I go back to the time, that in technology cases,
18    especially dealing with privacy, where many times you have
19    ongoing harms, being able to reach a resolution quick for
20    the plaintiffs, it really matters.  And the way these
21    cases tend to shake out is the motion to dismiss is a
22    really important point about whether the case will be
23    resolved or not.
24         THE COURT:  I hear you.  So I think that what I'm
25    doing in my order will help define the lay of the land.
```

1    Because I'm not giving any kind of preliminary ruling on

2    the motions.  But I have a very robust fact section that,

3    I think, is catching all the big points.  So, you know,

4    good lawyers usually know when the Supreme Court comes out

5    how that may or may not affect the standing analysis, and

6    whether they want to stipulate, for example, based on my

7    calling out of the allegations as they exist, which may

8    well be enough -- because I'm going to put out my whole

9    standing argument in this order.  And if you agree that

10   there is standing -- or not; it's up to you.  I mean,

11   whatever.  And you do agree to a, you know, a stipulated

12   amended complaint, sometimes people do that to narrow the

13   litigation -- you will let me know if you're going to do

14   that or go through a different way.

15           MR. EDWARDS:  Just one point to clarify.  I'm

16   happy to address the stuff now, VPPA --

17           THE COURT:  No, you don't have to.  I was just

18   going to let you know what I was thinking.

19           MR. EDWARDS:  We'll get into the argument -- I

20   guess sounds like next time we can do that, coupled with

21   the standing.

22           But when you -- when I looked at the paragraphs

23   particularly related to the ordinary course exception, I

24   would say that yes, it's pleading, so you can't find facts

25   contrary to what's pled.  But if the facts that are there

1    are sufficient to meet the definitions, you know, it's an

2    interpretation of the statutory definition and the

3    legislative history about what the statutory definition

4    means.  So I think that's a really important issue.  And,

5    you know, at the end of the day, there may be some lack of

6    detail associated with the allegations with VPPA claim on

7    some of the key questions because the complaint was

8    covering a much wider waterfront than it appears the

9    litigation is now.

10           So it may be that, you know, I would argue

11   there's enough in the complaint to rule in our favor.  But

12   it may also be that there just needs to be more clarity

13   about what the contentions are, because I don't think the

14   opposition and the complaint necessarily were on all fours

15   with the descriptions.

16           THE COURT:  Right.

17           MR. EDWARDS:  And that can be important, from an

18   allegation perspective.  Because we live with the

19   complaint.  We don't live with the opposition.

20           THE COURT:  I completely agree with that.  At the

21   end of the day, I think that the argument was that the

22   exception for ordinary course of business was defined

23   pretty narrowly, and my view was whatever the merits are

24   to your contention that you used these third-party

25   providers to deliver targeted advertisements to your

1    users, it -- we're at the pleading stage.  So that was, I

2    think, my reaction to it.  So that's what I think.

3         And the bricks and mortar analysis was a little

4    bit different, which is that -- how Congress, you know,

5    looks at business, sort of, and is -- I think it's

6    relevant to consider the context in which it actually

7    talks very narrowly about the videotapes and other similar

8    video content.  So that was my observation about the

9    legislative history.

10        And here, whatever the merits are -- it's

11   something to think about for argument next time.

12        MR. KAMBER:  From looking at it from plaintiff's,

13   we were pleading this.  The statute -- certainly we view

14   it as a bit clearer than defendants view it.  And you

15   know, it was interesting to us that they made the ordinary

16   course argument, given our perspective of the statute

17   laying out its three particular components of that.  Also,

18   the bricks and mortar concept was interesting, because

19   even in the testimony before Congress by --

20        THE COURT:  I saw it.

21        MR. KAMBER:  You know, nobody before Congress,

22   you know, from the industry was saying, Hey, streaming

23   isn't covered.  In fact, NetFlix and Facebook, they only

24   rolled out -- and I was actually reading the testimony --

25   they rolled out, which is so interesting here, they rolled

1    out their product internationally that would provide the

2    streaming video and sharing that data.  They refused to

3    roll it out in the United States because -- not because

4    they didn't know whether streaming was covered under VPPA.

5    But because they weren't happy with the consent aspects of

6    VPPA and they didn't think they could roll it out and get

7    effective consent under VPPA as it's currently construed.

8    And I think that's really interesting because Hulu here is

9    taking an argument much farther than the industry has.  No

10   one from the industry went before Congress and said

11   streaming isn't covered.

12           THE COURT:  Well, they couldn't.

13           MR. KAMBER:  And that's what plaintiff's --

14           THE COURT:  Not since 19 --

15           MR. KAMBER:  The idea somehow that Judge Borg had

16   streaming videos you could see that at a hearing, but if

17   you took physical copies you couldn't, just doesn't make a

18   lot of sense.  So we didn't put a lot of effort in the

19   complaint of dealing with the bricks and mortar, dealing

20   with the exception, because these were dancers on the head

21   have a statutory pin.  That now we know that's their focus

22   and that's the argument they're going to come in here and

23   make, maybe there will be allegations more to that, but I

24   think that they're sufficiently pled to trigger the

25   statute and realize that, you know, this case fits very

1   squarely from our perspective into the four corners of the

2   statute.

3            THE COURT:  I understand.  My only observation

4   was, you know, given the concern with privacy, it does

5   influence how one considers who Congress was planning to

6   target.  And, you know, you do have -- I think it was

7   Senator Leahy's, you know, pronouncements that were

8   incorporated in the -- completely entertaining, and

9   completely right, right?  But what could be done with

10  computers -- anyway, it's just an observation.

11           MR. KAMBER:  And Senator Simon made the same

12  observation.

13           THE COURT:  In any event, it would be a dismissal

14  without prejudice if we ended up deciding it wasn't

15  enough, but I think there's an argument it is, and come

16  back on do it next time.

17           MR. EDWARDS:  I don't want to take up more of

18  your time today arguing that.  I do want to be heard, make

19  the observation that --

20           THE COURT:  Oh, no, of course.

21           MR. EDWARDS:  -- that Mr. Kamber's comments about

22  what NetFlix and Facebook's position is are not

23  representing either of them here.  And words matter.  And

24  the statutory words matter.  So I'd love to engage on that

25  issue.

1          THE COURT:  I thought it might be helpful when

2     you come back to know some of the things I'm thinking

3     about.

4          Thank you very much.

5          MR. EDWARDS:  Thank you.

6          MR. KAMBER:  Thank you very much.

7          (Adjourned)

8                              oOo

9

10

11

12

13

14

15

16               CERTIFICATE OF REPORTER

17

18          I, Connie Kuhl, Official Reporter for the United
      States Court, Northern District of California, hereby
19    certify that the foregoing proceedings were reported by me,
      a certified shorthand reporter, and were thereafter
      transcribed under my direction into written form.

20

21    _____

22               Connie Kuhl, RMR, CRR
                 Friday, August 3, 2012

23

24

25