1   ROBERT M. SCHWARTZ (S.B. #117166)
    rschwartz@omm.com
2   STEVEN M. DUNST (S.B. #281848)
    sdunst@omm.com
3   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, Seventh Floor
4   Los Angeles, California  90067-6035
    Telephone:     (310) 553-6700
5
    KATHERINE M. ROBISON (S.B. #221556)
6   krobison@omm.com
    O'MELVENY & MYERS LLP
7   Two Embarcadero Center, 28th Floor
    San Francisco, CA  94111-3823
8   Telephone:     (415) 984-8700
    Facsimile:     (415) 984-8701
9
    Attorneys for Defendant Hulu, LLC
10

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: HULU PRIVACY LITIGATION | Case No. 4:11-cv-03764 LB |
| | **NOTICE OF MOTION AND MOTION BY HULU, LLC FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES** |
| | Hearing Date:   Not Set |
| | Time:             Not Set |
| | Courtroom:      C |
| | Judge:           Hon. Laurel Beeler |

1    TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD: Notice is hereby given that

2  Defendant Hulu, LLC ("Hulu") hereby moves the Court for summary judgment or, in the

3  alternative, partial summary judgment, to be heard on a date set by the Court, in Courtroom C of

4  the above-captioned Court, at 450 Golden Gate Ave., San Francisco, CA 94102.  This motion is

5  brought pursuant to Federal Rule of Civil Procedure 56 on the grounds that no genuine issue of

6  fact exists on plaintiffs' sole claim for relief, for violation of the Video Privacy Protection Act

7  ("VPPA"), and that Hulu is entitled to judgment as a matter of law.

8    Hulu moves for summary judgment on the three grounds set forth below.  If the Court

9  does not dispose of plaintiffs' VPPA claim in its entirety, Hulu requests in the alternative that the

10  Court grant partial summary judgment under Rule 56(a) and/or enter an order under Rule 56(g)

11  specifying the material facts that the Court does not believe are in dispute, and/or specifying

12  which of the following issues and sub-issues should be subject to an order of partial summary

13  judgment:

14    1.    As to alleged disclosures of information about Hulu users, including the

15      named plaintiffs, to Hulu's service providers (as described in the attached memorandum

16      of law), Hulu did not disclose Personally Identifiable Information (PII), as that term is

17      defined under the VPPA.

18    2.    As to alleged disclosures of information to Facebook concerning any Hulu

19      user, including the named plaintiffs, who connected his or her Hulu account to his or her

20      Facebook account, any alleged disclosures of such information did not violate the VPPA

21      because any such disclosures were made:

22        a.    "in the ordinary course of business" (under section 2710(b)(2)(E))

23          in the form of "request processing" and "order fulfillment" (as defined in section

24          2710(a)(2)); and/or

25        b.    with the consent of the consumer (under section 2710(a)(2)(B));

26          and/or

27        c.    "to the consumer" (under section 2710(b)(2)(A)).

28

3.      No Hulu user (including no named plaintiff) sustained any actual harm, injury, or damages.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities filed herewith, the Declarations of Jeff Yang, Xinan Wu, and Katherine M. Robison and the exhibits thereto, the argument of counsel, all other pleadings on file in this action, and any other matters properly considered by the Court at the hearing on this motion.


Dated: July 15, 2013                          ROBERT M. SCHWARTZ
                                              KATHERINE M. ROBISON
                                              STEVEN M. DUNST
                                              O'MELVENY & MYERS LLP


                                              By: _/s/ Robert M. Schwartz_
                                                   Robert M. Schwartz
                                              Attorneys for Defendant Hulu, LLC

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   UNDISPUTED FACTS ........................................................................................ 3

    A.    The Hulu Service and User Interface ..................................................... 3

    B.    Hulu's Business Operations .................................................................... 3

    C.    Hulu's facebook.com Integration ........................................................... 5

III.  LEGAL STANDARD ........................................................................................... 8

IV.   HULU IS ENTITLED TO SUMMARY JUDGMENT ...................................... 9

    A.    The Information Hulu Gave to Service Providers Does Not Violate the
        VPPA ....................................................................................................... 9

        1.    Hulu Does Not Disclose PII. ...................................................... 9

        2.    The Possibility That a Third Party Could Have "Reverse
            Engineered" a Link Between Information On a User Profile Page to
            Video Viewing Information Does not Constitute a VPPA Violation
            by Hulu. ..................................................................................... 11

    B.    The Facebook "Disclosures" Fall Within the Express Statutory Exceptions ....... 13

        1.    The Posting of Video Watch Information on Facebook Timelines
            Was Only in Response to Users' Requests and Orders, and So Is
            Exempt Under the VPPA. ......................................................... 14

        2.    Plaintiffs Consented to The Facebook Disclosures. .................. 15

        3.    The Disclosures Were Made "To the Consumer." ...................... 16

    C.    Because Plaintiffs Have No Actual Injury, They Are Not Entitled to An
        Award of Damages. ............................................................................... 18

V.    CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amazon.com LLC v. Lay*,
  758 F. Supp. 2d 1154 (W.D. Wash. 2010) ................................................................. 9

*Bamon Corp. v. City of Dayton*,
  730 F. Supp. 80 (S.D. Ohio 1990) ............................................................................ 9

*Barker v. Int'l Union of Operating Eng'rs, Local 150*,
  641 F. Supp. 2d 698 (N.D. Ill. 2009) ..................................................................... 13

*Camfield v. City of Oklahoma City*,
  248 F.3d 1214 (10th Cir. 2001)................................................................................ 9

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................. 9

*City News & Novelty, Inc. v. City of Waukesha*,
  487 N.W.2d 316 (Wis. Ct. App. 1992) .................................................................. 16

*Dirkes v. Borough of Runnemede*,
  936 F. Supp. 235 (D.N.J. 1996) .............................................................................. 9

*Doe v. Chao*,
  540 U.S. 614 (2004) ............................................................................................... 19

*Gonzalez v. Cent. Elec. Coop., Inc.*,
  No. 08-6236-HO, 2009 U.S. Dist. LEXIS 98104 (D. Or. Oct. 15, 2009).............. 10

*In re Online DVD Rental Antitrust Litig.*,
  No. M09-2029, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011)............................. 19

*Lahr v. NTSB*,
  453 F. Supp. 2d 1153 (C.D. Cal. 2006), *rev'd in part on other grounds,* 569 F.3d 964
  (9th Cir. 2009)....................................................................................................... 10

*Low v. LinkedIn Corp.*,
  No. 11-cv-1468, 2012 WL 2873847 (N.D. Cal. July 12, 2012)............................. 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................. 9

*Millennium TGA, Inc. v. Comcast Cable Commc'ns, LLC*,
  286 F.R.D. 8 (D.D.C. 2012)................................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Mollett v. Netflix, Inc.*,
    Case No. 5:11-CV-01629-EJD, 2012 WL 3731542 (N.D. Cal. Aug. 17,
    2012) ............................................................................................. 12, 16, 17, 18

*Parker v. Time Warner Entm't Co.*,
    No. 09 CV 4265 (ERK), 1999 WL 1132463 (E.D.N.Y. Nov. 8, 1999) ................................... 9

*Pruitt v. Comcast Cable Holdings, LLC*,
    100 F. App'x. 713 (10th Cir. 2004) ............................................................... 9, 12, 13

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) .................................................................... 8, 9

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*,
    No. 09-4567, 2011 U.S. Dist. LEXIS 26757 (D.N.J. Mar. 15, 2011) .................................. 9

*Steinberg v. CVS Caremark Corp.*,
    No. 11-2428, 2012 WL 507807 (E.D. Pa. Feb. 16, 2012) ...................................... 13

*Sterk v. Redbox Automated Retail, LLC*,
    672 F.3d 535 (7th Cir. 2012) ................................................................ 19

*Viacom Int'l Inc. v. YouTube Inc.*,
    253 F.R.D. 256 (S.D.N.Y. 2008) ............................................................ 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ......................................................................... 19

**STATUTES**

5 U.S.C. § 552a ......................................................................... 18

18 U.S.C. § 2710 ...................................................................... *passim*

**RULES**

Fed. R. Civ. P. 56 ...................................................................... 8, 9

**OTHER AUTHORITIES**

158 Cong Rec H 6851 (Dec. 18, 2012) ...................................................... 16

BLACK'S LAW DICTIONARY (9th ed. 2009) ................................................. 18

H.R. 6671, 112th Cong. (2d Session 2012) ................................................. 15

1    **I.     INTRODUCTION**

2          In this misguided lawsuit under the Video Privacy Protection Act ("VPPA"), five Hulu

3    users are suing over disclosures of non-identifying information the VPPA does not protect and

4    over disclosures they asked Hulu to make.  Plaintiffs allege that Hulu violated the VPPA by

5    sending information to third parties that identified plaintiffs and what they watched, without their

6    consent.  But plaintiffs can point to disclosures of only: (1) strings of numbers that Hulu gives, in

7    lieu of identifying information, to two companies that render services that enable Hulu to operate

8    ("service providers"), and (2) the names of videos that users requested Hulu to send to their own

9    Facebook accounts.  Plaintiffs' VPPA assertions are baseless and, as explained below, Hulu is

10   entitled to prevail as a matter of law.

11         Service Providers:  Plaintiffs' allegation that Hulu discloses its users' names combined

12   with what they watch is utterly false.  When Hulu discloses user information to service providers,

13   Hulu never combines the two pieces of information that must both be disclosed to form a VPPA

14   violation: information that actually identifies the person (such as a real name and address) and the

15   names of videos that person watched (collectively, "PII").  When Hulu needs to disclose a user's

16   name to a service provider, such as a vendor that processes that user's credit card payments, Hulu

17   does not disclose the titles of the videos that user watched.  Conversely, when Hulu needs a

18   service provider to have information about what a user watched, such as a vendor that tallies the

19   number of times an advertiser's commercial was shown with a particular program, Hulu does not

20   disclose the user's name or address.  Instead, Hulu refers to that user by a nameless, multi-digit

21   number, for example: 2513746 (the "User ID").  These facts are not subject to dispute, and they

22   defeat this half of plaintiffs' claim.

23         To forestall defeat, plaintiffs' complaint suggests the theoretical possibility that a service

24   provider that received video titles could have used the anonymous User ID and Hulu's since-

25   discontinued user profile pages to re-identify a user by name.  Such a theoretical possibility of

26   "reverse engineering" does not constitute a VPPA violation.  Further, there is no evidence that

27   this ever happened.  Even if it had, Hulu is not liable for disclosing non-identifying information

28   that a third party manipulates to identify a user.  That is not a disclosure of PII by Hulu.

1        <u>Facebook</u>:  The other half of plaintiffs' claim concerns information sent to Facebook user

2  accounts that the user may have allowed others to see on their Facebook profile pages (called

3  "timelines").  Hulu does not dispute that it provides the infrastructure through which Hulu users

4  can post on their Facebook timelines what they watched on hulu.com.  But for three reasons,

5  Hulu's provision of these optional integration features does not violate the VPPA.  First, Hulu's

6  conduct constitutes customer "order fulfillment" and "request processing"—acts that the VPPA

7  places outside its reach.  Second, Hulu's users <u>consented</u> to those disclosures.  Third, the VPPA

8  exempts disclosures <u>to</u> the consumer.  Information Hulu sends to the user's Facebook account is

9  disclosed to that user alone, unless the user decides to allow others to see it—just as an email is

10  sent to a user's in-box and its content shared with no one else unless the user decides to forward

11  it.  Hulu cannot be liable simply because the user chose to share that information with others.

12        Moreover, plaintiffs' Facebook claims, like their fallback service provider theory, are

13  purely theoretical: four of the plaintiffs admit that they never enrolled in or used any Facebook

14  integration method, and the fifth, who reportedly signed up for one method, does not recall which

15  method she used or when she used it, and does not claim to have posted any watch information to

16  her Facebook timeline.  Thus, no named plaintiff has a VPPA claim related to Facebook.

17        Apart from these liability defects, there is a separate grounds for summary judgment:

18  Plaintiffs have suffered no injury.  The VPPA states that a court may award actual damages, but

19  not less than a specified amount of liquidated damages, to a "person aggrieved" by an improper

20  disclosure.  A "person aggrieved" is one who has been injured.  As revealed in their interrogatory

21  responses, discussed below, plaintiffs were not injured.  Plaintiffs apparently believe they have no

22  need to show injury because the VPPA allows for liquidated damages.  Plaintiffs are wrong.  The

23  VPPA's authorization of liquidated damages does not eliminate plaintiffs' need to prove actual

24  injury as a prerequisite to recovering the liquidated amount.  Given the absence of any injury,

25  Hulu is entitled to prevail.

26        Hulu takes its users' privacy rights seriously and protects them vigorously.  Under any

27  common sense application of the VPPA, the Court can and should dispose of this case now.

28

## II.      UNDISPUTED FACTS

### A.      The Hulu Service and User Interface

Since 2007, Hulu has operated www.hulu.com, a website that allows a user to watch television programs, motion pictures, and other videos, and to do so when the user wants ("on demand"), as opposed to only according to a broadcaster's schedule.  Hulu pioneered the use of an Internet-based platform to make such content available for viewing outside traditional television distribution methods.  (Declaration of Jeff Yang ("Yang  Decl."), ¶ 2.)

A person does not need to create a Hulu account to watch videos on hulu.com.  But if one chooses to register, there are two types of accounts: free and paid (also called "Hulu  Plus").  A Hulu free account gives the user access to a large library of content for viewing primarily on a personal computer at a "standard definition" resolution level.  A Hulu Plus account gives the user access to more content, in high definition, that can be accessed through other devices, such as a game console or Internet-connected TV.  (Yang Decl., ¶ 5.)

To register for either type of account, the user enters a first and last name, birthdate, gender, and an email address.  Hulu does not verify the accuracy of that information, but does store it in a secure database.  (*Id*. ¶¶ 6, 7.)  Users can change that information using their Hulu account control panel, to which only they have access and through which they could control what information was visible on their Hulu profile page (discussed in more detail *infra*).  (Declaration of Xinan Wu ("Wu Decl."), ¶¶ 8-11.)

### B.      Hulu's Business Operations

To stream content to its users, Hulu obtains permission through licenses from studios, networks, and other rights holders.  (Yang Decl., ¶ 11.)  Hulu also needs the assistance of businesses that furnish specialized services.  These "service providers" include companies that provide hosted servers, store and stream videos and commercials, verify and process credit card payments, and measure the volume of viewer activity.  (*Id*. ¶¶ 25, 26.)

Advertising revenue is Hulu's main source of income.  (*Id*. ¶ 12.)  Advertisers pay Hulu to run commercials at periodic breaks during video playback.  The amount they pay Hulu is based generally on the number of times an advertisement has been viewed by a different user (the model

HULU'S MOTION FOR SUMMARY JUDGMENT
NO. 4:11-CV-03764 LB

1   is referred to "CPM," or cost per mille, which charges advertisers per one thousand impressions).

2   Hulu must therefore gather metrics regarding audience size as part of its operations.  (*Id.* ¶ 14.)

3        To gather such data, while preserving its users' privacy, Hulu assigns each user a unique

4   number with a minimum of seven digits, e.g., "2695387" ("User ID").  The User ID does not

5   constitute or contain personal information—it is just a number.  Hulu has never provided any

6   third party with a "lookup table" or other tool that links a User ID to a user's name or other

7   personal information.  (*Id.* ¶¶ 18, 19.)

8        For purposes of evaluating whether disclosure of user information to service providers

9   violates the VPPA, this motion focuses on two research and reporting companies: comScore, Inc.

10   and The Nielsen Company.  Hulu hired them to provide metrics regarding the size of the audience

11   for programming on hulu.com.  Other types of service providers may receive a <u>narrower</u> set of the

12   information Hulu sent or sends to comScore and Nielsen.  (*Id.* ¶¶ 25, 26.)  Because, as explained

13   below, the user information Hulu sends comScore and Nielsen does not rise to the level of a

14   VPPA violation, it necessarily follows that plaintiffs cannot establish a VPPA claim as to any

15   service provider that receives fewer types of information.

16        As relevant here, Hulu sends comScore and Nielsen four types of information: (a) the

17   Hulu "User ID," (b) the "GUID," (c) the "Ad ID," and (d) the name of the program (for videos

18   that have a season and episode number, that data, as well).  (Yang Decl., ¶ 17.)  This is the most

19   information Hulu provides to any one service provider.  (*Id.* ¶¶ 25, 26)

20        •   As noted above, the "User ID" is a number with at least seven digits that Hulu

21        assigns to each new registered user.  The User ID does not include any identifying

22        information for the user.  It takes the following form: 1735992.  (*Id.* ¶18.)

23        •   The GUID is a string of numbers and letters that Hulu assigns at random to a web

24        browser when a user accesses hulu.com.  The GUID does not contain any

25        identifying information for the user.  It takes the following form:

26        767DE299767B4E577B787B40B5123C30.  (*Id.* ¶ 21.)

27        •   The Ad ID is a unique number assigned to each ad.  It does not identify anything

28        but the advertisement.  It takes the following form: 234104.  (*Id.* ¶ 23.)

HULU'S MOTION FOR SUMMARY JUDGMENT
NO. 4:11-CV-03764 LB

1    Hulu does not share its users' name, mailing address, email addresses, or other identifying

2    information with any service provider that also receives information about what Hulu users

3    watch; the only user information such service providers receive is the anonymous User ID.  (*Id.*

4    ¶ 27.)  Hulu discloses users' names or billing addresses to service providers who need that

5    information to perform limited services on Hulu's behalf, such as the processing of credit card

6    payment requests; but Hulu does not send such service providers any video title information.  (*Id.*

7    ¶ 26.)  Hulu has never given any service provider a "look up table" or other tool linking User IDs

8    with the personal identity of any Hulu user.  (*Id.* ¶ 19.)

9    **C.    Hulu's facebook.com Integration**

10    During the period covered by this case, Hulu has allowed users to request that certain

11    information be sent to their Facebook accounts, which the user may post to their Facebook

12    timeline.  A Facebook "timeline" is that company's current version of its user profile page, where

13    a user can post activity the user wants others to know about.  (*See* http://blog.facebook.com/blog

14    php?post =10150408488962131).  In the last two years, Hulu has offered its users three methods

15    of sending information about their activities on hulu.com to their Facebook accounts.  While the

16    features and interfaces of each method differed, all three were identical with regard to what

17    matters under the VPPA: information was posted to Facebook only in response to users' requests

18    and orders, the users had to consent to the disclosures before Hulu made them, and the disclosures

19    are made <u>to</u> the users, who decide whether to share with anyone else.  (Wu Decl., ¶¶ 29, 38, 52.)

20    To avoid any doubt, each of the Facebook posting methods is described below.  However, as

21    noted above, four of the five plaintiffs never integrated their Hulu and Facebook accounts, and the

22    fifth plaintiff, who claims to have used an unidentified integration feature, does not claim to have

23    posted any video watch information to her Facebook timeline.  (Declaration of Katherine M.

24    Robison ("Robison Decl."), ¶5, Ex. B, Response to Interrogatory No. 3.)  Hulu does not have any

25    record of the plaintiffs using any of these three Facebook integration features.  (Wu Decl., ¶ 53.)

26    <u>Facebook Connect</u>:  In July 2011, Hulu began offering a feature called "Facebook

27    Connect" to allow users who were Facebook account holders to send limited information about

28    their use of hulu.com to their Facebook accounts.  (Wu Decl., ¶ 13.)  A Facebook Connected user

could choose to send Hulu "show favorites," "star ratings," and comments.  (*Id.* ¶ 14.)  But before Hulu would comply with a user's request to send that information, the user had to authorize Hulu to do so.  (*Id.* ¶¶ 14, 15, 28, 29.)

<u>Hulu on Facebook</u>:  From September 2011 to April 2012, Hulu allowed Facebook users to watch Hulu content from within facebook.com using an application called "Hulu on Facebook" (referred to internally at Hulu as the "Canvas App").  (Wu Decl., ¶ 32.)  Hulu on Facebook was accessible only through facebook.com and was subject to Facebook's privacy controls and permission system.  (*Id.* ¶¶ 32, 33, 38.)  If a user wanted his or her Facebook "friends" to see the titles of watched videos, the user needed to configure the privacy settings to enable that.  (*Id.* ¶¶ 33, 36, 39.)  The user could designate whom to share with on Facebook: "Everyone," "My friends," or "No one."  (*Id.* ¶¶ 21, 37.)  Video titles could be posted, but only if the user opted to share the information with his or her Facebook "friends."  (*Id.* ¶¶ 35, 36.)

<u>Auto-Publish</u>:  Hulu launched "Facebook Auto-Publish" on April 26, 2012 as an enhancement to Facebook Connect.  (Wu Decl., ¶ 41.)  This feature allows Facebook Connect users to send their Hulu video watch activity to their Facebook accounts.  (*Id.*)  Auto-Publish includes a Unified Social Controller, which controls the sending of video watch activity.  (*Id.* ¶¶41-45.)

The Unified Social Controller is accessible on every Hulu page on which a video can be watched.  (*Id.*)  To activate the Auto-Publish function and send video watch activity to Facebook, users must, among other things: (a) connect their Facebook account with their Hulu account, and (b) click the "Share My Activity" button on the roadblock screen.  Otherwise, a user's watch activity will not be sent to the user's Facebook account.  (*Id.* ¶¶ 42, 43.)  This is illustrated below:

1
2
3
4
5
6
7
8
9
10
11



12   Even after turning on the feature by clicking "Share My Activity," Hulu provides an

13   additional on-screen reminder (circled in red ) that the user has requested to send the title of the

14   viewed video to the user's Facebook account.  If the user does not want to send that information,

15   the user need only click "Don't share" in the reminder box.  (*Id*. ¶ 47-48.)

16
17
18
19
20
21
22
23
24
25
26
27
28

In addition, and as shown below, even after a user opts to publish watch activity, Hulu's Unified Social Controller constantly reminds the user that he or she has linked the Hulu account to his or her Facebook account (blue circle), is sending information to his or her Facebook account (yellow circle), can change those settings (green circle), and lists recently watched videos so the user can manage, on a video-by-video basis, which titles to send to his or her Facebook account (red circle).  (*Id.* ¶ 50.)



As these screens demonstrate, Hulu has imposed numerous and often redundant systems and steps to ensure that information will be sent to the user's Facebook account only if the user requests it and is aware of it, and that Hulu requires the user to take affirmative steps to consent. Even then, Hulu has made sure that the user can easily change those settings at any time.

## III.   LEGAL STANDARD

"Summary judgment is appropriate when the pleadings, affidavits and other material present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432 (9th Cir. 1995); *see also* Fed. R. Civ. P. 56(a).  "If the moving party shows that there is an absence of evidence to support the plaintiff's case, the nonmoving party bears the burden of producing evidence sufficient to

1    sustain a jury verdict on those issues for which it bears the burden at trial." *Rebel Oil*, 51 F.3d at

2    1435.  The non-moving party can only create a "genuine" dispute on a material issue by adducing

3    admissible evidence on the issue which is sufficient for a reasonable jury to find for the non-

4    moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986)

5    (citing Fed. R. Civ. P. 56(e)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

6    **IV.     HULU IS ENTITLED TO SUMMARY JUDGMENT**

7           **A.     The Information Hulu Gave to Service Providers Does Not Violate the VPPA**

8                  **1.     Hulu Does Not Disclose PII.**

9           Hulu cannot be liable for disclosing an anonymous User ID to comScore or Nielsen, or to

10   any other service provider.  To maintain a VPPA claim, Plaintiffs must prove that Hulu disclosed

11   information identifying: (1) a particular person <u>and</u> (2) the particular video that person requested

12   or watched.  18 U.S.C. § 2710(a)(3) (defining PII as "information which <u>identifies a person</u> as

13   having requested or obtained <u>specific video materials</u> or services…") (emphasis added); *Bamon*

14   *Corp. v. City of Dayton*, 730 F. Supp. 80, 91 (S.D. Ohio 1990) (VPPA prohibits the disclosure of

15   customer names <u>along with</u> the videos they have rented or purchased).[1]

16          Courts find VPPA violations where there has been a disclosure of <u>both</u> the individual's

17   name <u>and</u> the title of the video.  *See, e.g.*, *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1159

18   (W.D. Wash. 2010) (request for all sales data, which would have revealed buyer's name and

19   address connected to the title of any videos purchased, prohibited by the VPPA); *Dirkes v.*

20   *Borough of Runnemede*, 936 F. Supp. 235, 236 (D.N.J. 1996) (obtaining the title and rental dates

21   of videos rented by plaintiff was a violation of VPPA); *Camfield v. City of Oklahoma City*, 248

22   F.3d 1214 (10th Cir. 2001) (obtaining name and address of persons who rented a particular video

23   from video store was a VPPA violation).  But where the defendant has <u>not</u> disclosed both of those

24

25   _____

     [1] In interpreting "PII" under an analogous statute (the Cable Communications Policy Act of
26   1984), courts have held that PII is data that "personally identifies" a specific individual.  *Smith v.*
     *Trusted Universal Standards in Elec. Transactions, Inc*., No. 09-4567 (RBK/KMW), 2011 U.S.
     Dist. LEXIS 26757, at *44-46 (D.N.J. Mar. 15, 2011); *Pruitt v. Comcast Cable Holdings, LLC*,
27   100 F. App'x. 713, 716-17 (10th Cir. 2004) (PII is "specific information about the
     subscriber…."); *see also Parker v. Time Warner Entm't Co*., No. 09 CV 4265 (ERK), 1999 WL
28   1132463, at *9 (E.D.N.Y. Nov. 8, 1999) (noting that the Cable Act is "analogous" to the VPPA).

1   two pieces of information, no violation will be found.  *See Gonzalez v. Cent. Elec. Coop., Inc*.,

2   No. 08-6236-HO, 2009 U.S. Dist. LEXIS 98104, at *22 (D. Or. Oct. 15, 2009) (no VPPA

3   violation where defendants obtained records showing plaintiff had rented one of fifteen available

4   movie titles because records did not identify the specific video plaintiff viewed).

5        Hulu has never disclosed both pieces of information to any service provider.  Although

6   Hulu provides comScore and Nielsen with the titles of videos its users have watched, Hulu does

7   not also tell them (or any others who receive video viewing information) the names, addresses,

8   emails, or birthdate of anyone who watched that video.  (Yang Decl., ¶¶ 17, 27.)[2]  To protect its

9   users' privacy, Hulu uses an anonymous User ID, which does not reveal the name or any other

10   identifying information about a user.  (*Id*. ¶ 18.)  The User ID anonymously differentiates among

11   users and allows Hulu to obtain metrics regarding its audience without having to give comScore

12   or Nielsen a user name, email address, or other personal information.  (*Id*. ¶¶ 15, 18, 27.)  Hulu

13   has never provided any service provider (or anyone else) with a "lookup table" that maps User

14   IDs to the name or other identifying data of Hulu users.  (*Id*. ¶ 19.)

15        These facts dispose of this half of plaintiffs' VPPA claim.  No court has found—under

16   any statute, let alone the VPPA—that a unique but anonymous identifier constitutes identifying

17   information.  *See, e.g.*, *Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 262 (S.D.N.Y. 2008)

18   (holding disclosure of YouTube users' login IDs and IP addresses in connection with their video

19   viewing content did not violate the VPPA; the login ID is an anonymous pseudonym that users

20   create for themselves that "cannot identify specific individuals"); *see also Lahr v. NTSB*, 453 F.

21   Supp. 2d 1153, 1183 (C.D. Cal. 2006), *rev'd in part on other grounds,* 569 F.3d 964 (9th Cir.

22   2009) (in context of FOIA requests "[d]efendants do not explain how the disclosure of witness

23   identification numbers, alone, could provide access to these individuals or any personally

24   identifying information about them.  Furthermore, the identification numbers are not personal

25   information of a nature ordinarily protected by the courts under [the Act], such as social security

26   numbers or personnel records.").  Thus, this "disclosure" cannot constitute a VPPA violation.

---

[2] Hulu discloses such personal information to payment processors, who need it to process the user's payment, and to email marketing providers, who receive email addresses. (Yang Decl., ¶ 27.)  However, these companies do not also receive video watch information.  (*Id*.)

HULU'S MOTION FOR SUMMARY JUDGMENT
NO. 4:11-CV-03764 LB

1    **2.      The Possibility That a Third Party <u>Could</u> Have "Reverse Engineered"**

2    **a Link Between Information On a User Profile Page to Video Viewing**

3    **Information Does not Constitute a VPPA Violation by Hulu.**

4         Plaintiffs' complaint implies that Hulu violated the VPPA because it was <u>possible</u> that a

5    rogue employee of comScore or Nielsen <u>could</u> <u>have</u> used a User ID to find a user's Hulu profile

6    page (which contains a first and last name).  (*See* Complaint, ¶ 23 (alleging that Hulu gives

7    comScore a "profile ID" linked to each user's profile page, which page contains personal

8    information).)  Plaintiffs appear to speculate that, because Hulu sends comScore and Nielsen the

9    titles of videos associated with User IDs, a rogue employee could have "reverse engineered"

10   identifying data that could be linked to the video information to create a VPPA violation.  But

11   there is no evidence that this ever occurred and, even if it had, such third party conduct would not

12   have constituted a VPPA violation by Hulu.

13        Some additional background facts will be helpful.  Until May 31, 2013, Hulu provided

14   each registered user with a profile page.  (Wu Decl., ¶¶ 3, 5.)  Hulu originally intended the profile

15   page to serve a social network function, through which users could invite others ("Friends") to

16   see information posted on that page, such as names of a user's other Hulu Friends, the number of

17   videos they had watched, and the user's favorite movies and television shows.  (*Id.* ¶ 6.)  Hulu

18   applied a set of default privacy settings to the profile page that showed only the user's first and

19   last name, location, interests, and notes.  (*Id.* ¶ 9.)  A user could override those default privacy

20   settings to allow friends or the public to see more information—such as gender, email, and

21   birthdate.  (*Id.* ¶ 11.)  A user could invite another user to view the profile page by sending an

22   invitation.  (*Id.* ¶ 6.)  But Hulu did not provide a search function to allow one user to find and

23   view the profile page of any other user using a User ID.  (*Id.* ¶ 12.)  After May 2013, due to lack

24   of popularity, Hulu discontinued the user profile pages.  (*Id.* ¶ 5.)

25        As noted above, plaintiffs' complaint raises the possibility that the public portion of a

26   profile page could be seen by an uninvited viewer.  That was because the profile page URL

27   included the User ID, e.g.: www.hulu.com/profiles/u/1672345.  (Wu Decl., ¶ 3.)  Starting on

28   August 1, 2011, however, Hulu encrypted the User ID in the profile page URL, so that a URL

1   would read: www.hulu.com/profiles/u/wxu2RqZLhrBtVjYKEC_R4.  (*Id.* ¶ 4.)  That ended the

2   possibility that someone could use a User ID to access that user's profile page.

3          Even so, plaintiffs theorize that, before August 2011, if someone at comScore or Nielsen

4   knew that the profile page URL included the User ID, that person could have accessed a user

5   profile page and seen a user's first and last name, and then linked that to video viewing

6   information Hulu had separately provided to those service providers, thereby assembling the two

7   pieces of information whose disclosure is necessary to form a VPPA violation.  At no time during

8   the more than two years that this case has been pending did plaintiffs attempt to adduce any

9   evidence from comScore or Nielsen that this ever even happened.

10         But even if user names had been found through this multi-step reverse engineering,

11  plaintiffs' layers of theoretical speculation are insufficient to create VPPA liability against Hulu.

12  Disclosing information that is non-identifying does not create liability for Hulu merely because a

13  <u>third party</u> later combined with other information to identify a specific user.  A third party cannot

14  retroactively convert data that is not PII into PII, and have a court deem that as a disclosure <u>by

15  Hulu</u>, in violation of the VPPA.  As one court observed, "[t]he fact that Congress outlawed

16  disclosure to persons other than the consumer [under the VPPA] <u>does not mean that Congress

17  intended to prevent every conceivable manner in which a third party might gain access to a

18  consumer's PII</u>."  *Mollett v. Netflix, Inc*., Case No. 5:11-CV-01629-EJD, 2012 WL 3731542

19  (N.D. Cal. Aug. 17, 2012) (dismissing VPPA claim for alleged disclosure to plaintiffs' household

20  through Netflix home device) (emphasis added).  *See also Low v. LinkedIn Corp.*, No. 11-cv-

21  1468, 2012 WL 2873847, at *6 (N.D. Cal. July 12, 2012) ("allegations that third parties can

22  potentially associate LinkedIn identification numbers with information obtained from cookies and

23  can de-anonymize a user's identity and browser history are speculative and relatively weak").

24         Although decided under the Cable Act, the Tenth Circuit's decision in *Pruitt v. Comcast

25  Cable Holdings, LLC*, is instructive.  100 F. App'x. 713, 716-17 (10th Cir. 2004).  In rejecting a

26  "re-identification" argument under the Cable Act, the court examined "whether the information

27  stored within Comcast's converter boxes [was] personally identifiable information."  *Id.*

28  Comcast's converter boxes held a user's viewing data, but no information about the user

12

1   him/herself.  *Id.*  Simultaneously, Comcast held the user's contact information in its billing

2   system <u>and</u> possessed the ability to combine these two data sources.  Nevertheless, despite the

3   fact that the video viewing data on Comcast's converter box could be combined with a user's

4   billing data, both the district and circuit courts held that the converter boxes contained no PII.  *Id.*;

5   *see also Millennium TGA, Inc. v. Comcast Cable Commc'ns, LLC*, 286 F.R.D. 8, 15-16 (D.D.C.

6   2012) (providing a party with the city and state of residence of the subscribers associated with a

7   specific IP address does not disclose PII under the Cable Act even if the receiving party intends to

8   use that information to "re-identify" subscribers).

9       Decisions under other privacy statutes are in accord.  *See, e.g., Steinberg v. CVS*

10  *Caremark Corp.*, No. 11-2428, 2012 WL 507807, at *4-5 (E.D. Pa. Feb. 16, 2012) (dismissing

11  HIPAA claim by patients who alleged defendants sold confidential information; the mere

12  possibility that a third party could reidentify patients' de-identified information was not sufficient

13  to show defendants had disclosed legally protected data); *Barker v. Int'l Union of Operating*

14  *Eng'rs, Local 150*, 641 F. Supp. 2d 698, 705-06 (N.D. Ill. 2009) ("simply obtaining the CD

15  containing the motor vehicle records is not equivalent to obtaining the personal information

16  contained therein … having the ability to obtain the personal information (lawfully or unlawfully)

17  is not the same as actually obtaining the personal information" as required for a DPPA violation).

18              **B.        The Facebook "Disclosures" Fall Within the Express Statutory Exceptions**

19      The remaining category of conduct that allegedly violates the VPPA involves Hulu users

20  who choose to post what they watch on Hulu to their Facebook timelines.  For the three

21  independent reasons discussed below, this part of plaintiffs' claim is equally untenable.

22      Even without those defenses, which entitle Hulu to prevail on these claims, the Facebook

23  claims of <u>these</u> plaintiffs fail for an additional reason: none of them posted any watch information

24  to their Facebook timelines.  In fact, only one of the five plaintiffs even claims to have integrated

25  her Hulu and Facebook accounts, but apparently she has no knowledge of what integration

26  features she used and does not claim to have posted watch information to her Facebook timeline.

27  (*See* Robison Decl., ¶ 5, Ex. B, Response to Interrogatory No. 3.)  And based on the identifying

28

1   information plaintiffs provided Hulu in this lawsuit, Hulu could find no record of any of the

2   named plaintiffs even using these integration features.  (Wu Decl., ¶ 53.)

3          **1.**      **The Posting of Video Watch Information on Facebook Timelines Was**

4                     **Only in Response to Users' Requests and Orders, and So Is Exempt**

5                     **Under the VPPA.**

6          Congress enacted the VPPA to protect consumers against the indiscretions of businesses

7   who possess information about the video viewing habits of their customers.  It did not enact the

8   VPPA to create liability for disclosing information at the customer's request.  To make that clear,

9   the VPPA excludes disclosures made "in the ordinary course of business," *see* 18 U.S.C.

10  § 2710(b)(2)(E), which includes "request processing" and "order fulfillment," *Id.* at § 2710(a)(2).

11         When Congress adopted the VPPA in 1988, neither the Internet nor Internet-based

12  services like Hulu existed.  It could not have drafted the VPPA with them in mind.  If the VPPA

13  is to be read broadly to reach new technologies, like Hulu's Internet-based steaming distribution

14  service, then the VPPA's "request processing" and "order fulfillment" exemptions must be read

15  in light of how these newer technologies function.

16         Hulu's processing of its users requests to send information, that may include PII, to their

17  Facebook accounts falls within the ordinary course of business exemption.  Hulu does not send

18  this information on its own initiative.  Hulu does so only on a user's request and to fulfill that

19  user's order.  (*See* Wu Decl. ¶ 52.)  That is the case for each method of Facebook integration at

20  issue here:

21         Facebook Connect allows a Hulu user to connect Hulu and Facebook accounts and

22  thereafter send Hulu show favorites, show ratings, and comments to the user's Facebook account.

23  But this feature is optional—users must request Hulu to send this information to their Facebook

24  account by opting to connect their accounts and configuring their privacy settings to send such

25  information.[3]  (*Id.* ¶¶ 14, 15, 29.)  Any information disclosed through Facebook Connect thus

26  constitutes "request processing" under the VPPA and is exempt.

27

28  [3] The information transferred through Facebook Connect did not include the titles of videos
watched (*see* Wu Decl. ¶ 30); as a result, no VPPA violation could have occurred.

14   HULU'S MOTION FOR SUMMARY JUDGMENT
NO. 4:11-CV-03764 LB

1    The same is true for the Hulu on Facebook application (discontinued in April 2012).  The

2    titles of videos watched using the application could be sent to the user's Facebook account, but

3    only if the user specifically configured his or her privacy settings to request that it happen.  (*Id.*

4    ¶¶ 21, 36-38.)  The information again left Hulu's premises only because Hulu was processing its

5    customers' requests and fulfilling their orders.

6    As for the Auto-Publish feature, the information left Hulu only after users first connected

7    their Hulu and Facebook accounts, affirmatively opted-in to sharing through the Auto-Publish

8    feature, and requested that information be shared, which for existing Facebook Connect users

9    included overriding the default setting that kept the video viewing information private.  (*Id.* ¶¶ 42,

10   43, 46, 47.)  In the parlance of the VPPA, information posted to users' Facebook timelines

11   through Auto-Publish arrived there only because Hulu was processing its customers' requests and

12   fulfilling their orders.  Thus, no VPPA violation occurred.

13   **2.       Plaintiffs Consented to The Facebook Disclosures.**

14   Independent of "request processing" and "order fulfillment" made in the ordinary course

15   of business, Hulu cannot be liable for video viewing information sent to its users' Facebook

16   accounts because its users consented to those disclosures.

17   Under the VPPA's consent provision in effect before 2013, there is no violation if the

18   consumer gave written consent "at the time the disclosure is sought." 18 U.S.C. § 2710(a)(2)(B).

19   The statute did not require the video service provider to obtain consent when disclosures were

20   <u>made</u>, but to obtain consent only at the time the disclosures were <u>sought</u>.  This is important

21   because, contrary to the plain language of the statute, plaintiffs will likely assert (erroneously)

22   that Hulu needed to obtain consent each time the user watched a video.

23   When Congress amended the VPPA at the end of 2012, it made clear that "a video tape

24   service provider may obtain a consumer's informed, written consent on an ongoing basis," that

25   "consent may be obtained through the Internet" and that the bill was introduced "<u>to clarify</u>" these

26   matters—that is, not to <u>change</u> the law but to make clear that this already <u>was</u> the law.  *See* H.R.

27   6671, 112th Cong. (2d Session 2012) (emphasis added).  The legislative history similarly states

28   that the amendment "makes <u>clear</u> that a consumer can opt in to the ongoing sharing of his or her

15

1   favorite movies or TV shows without having to provide consent each and every time a movie is

2   rented" and also "<u>makes</u> <u>clear</u> that written affirmative consent can be provided through the

3   Internet …."  158 Cong Rec H 6851 (Dec. 18, 2012) (emphasis added).  Plaintiffs thus have no

4   basis to argue that Hulu needed its users' consent each time they watched a video.

5         There is no dispute that Hulu did, in fact, obtain users' consent.  Hulu did not activate any

6   of the Facebook integration features by default.  Instead, a user had (or has) to affirmatively

7   enroll in the feature, and then request that the information be sent to the user's Facebook account

8   and be posted to the Facebook timeline.  (Wu Decl., ¶¶ 15, 21, 33, 42, 43, 52.)  Hulu thus

9   obtained the necessary consent, and did so at the time the disclosures were sought by the users.

10                **3.        The Disclosures Were Made "To the Consumer."**

11        The VPPA exempts the disclosure of PII "to the consumer."  *See* 18 U.S.C.

12   § 2710(b)(2)(A) ("A videotape service provider may disclose personally identifiable information

13   concerning any consumer … to the consumer.").

14        Because plaintiffs requested that their video watch information be sent to their Facebook

15   accounts, their VPPA claim reduces to the concern that other persons peered over their "virtual

16   shoulders" (on their Facebook timelines) to see what they had watched.  But finding a VPPA

17   violation because a Hulu user allowed others to see the names of videos on their Facebook

18   timeline would be as unjustified as finding a VPPA violation in the brick-and-mortar video store

19   context where: (1) a customer walked into the store with a friend or family member, (2) asked the

20   clerk if the customer had any overdue video rentals, (3) the clerk looked up the account and, in

21   the presence of the friend or family member, told the customer the name of an overdue video.

22   *Mollett* rejected a VPPA claim under just such circumstances: "A court would surely hold that

23   this disclosure was 'to the consumer' even though the disclosure also reached her partner.  If she

24   had been concerned about the possibility of others receiving the disclosure, the responsibility to

25   prevent the disclosure from being overheard was hers, not the clerk's."  2012 WL 3731542 at *3.

26   *See also City News & Novelty, Inc. v. City of Waukesha*, 487 N.W.2d 316, 319 (Wis. Ct. App.

27   1992) (zoning requirements that permitted a customer's video viewing selection to be viewed by

28

HULU'S MOTION FOR SUMMARY JUDGMENT
                                                   NO. 4:11-CV-03764 LB

1  others on the premises not preempted by VPPA because VPPA only preempts laws that require

2  disclosure of customer viewing records).

3         If plaintiffs do not want people viewing their Facebook timelines to see the names of

4  videos they watched on Hulu, it is their responsibility—not Hulu's—to refrain from sending to

5  their timeline the information that Hulu initially sends only to them.  Hulu video watch

6  information that appears on a Facebook user's timeline comes first to that user's Facebook

7  account.  (Wu Decl., ¶¶ 20, 21, 28, 29, 38, 42, 43.)  Unless the user decides to post the video titles

8  to the timeline, it goes no further than the user's Facebook account (*id.* ¶¶ 29, 38, 42), just like an

9  email goes straight to a user's in-box and is never seen by anyone else, unless the user choses to

10  forward it.  Using Facebook's privacy settings, the user can decide to let others see the

11  information that Hulu had sent to his or her Facebook account.  (*Id.*)  But that does not change it

12  from what it was in the first instance—a disclosure "to the consumer" for purposes of the VPPA,

13  and therefore exempt.

14         *Mollett*'s facts underscore this.  The plaintiffs alleged that Netflix violated the VPPA by

15  showing a list of a subscriber's "recently watched" videos in the information visible when

16  accessing a subscriber's Netflix account, including on a set-top box.  2012 WL 3731542, at *1.

17  Plaintiffs showed that Netflix "automatically display[ed]" the subscribers' list of "recently

18  watched" video titles to people other than the subscriber, either because third parties saw the

19  information while watching the videos with the subscriber or gained access to the subscribers'

20  devices and used Netflix.  *Id.*  The court found that any such disclosure was made "to the

21  consumer" and therefore was not a VPPA violation:

22        [A]ny disclosure by Netflix here was <u>to devices that the Plaintiffs themselves</u>
      <u>authorized to access their accounts</u>.  If the Plaintiffs do not want those disclosures

23        to be 'overheard' by other members of their household, <u>they may restrict access to</u>
      <u>their devices</u>.  The observation that Netflix could have implemented a more secure

24        or private system is irrelevant.

25  *Id.* at *3-4 (emphasis added).

26         The same result should occur here.  The defendant in *Mollett* made the disclosures to

27  plaintiffs' devices.  Similarly, Hulu made these disclosures to the users' Facebook accounts.

28  Facebook users don't have to post what they watched on Hulu on their Facebook timelines, just as

1    the plaintiffs in *Mollett* didn't have to let others access their account information.  Here, the fact

2    that a Hulu user chose to post that information on their Facebook timeline for others to see does

3    not transform what Hulu did into something more than a disclosure "to the user" and does not

4    transform Hulu into a VPPA violator.

5            **C.    Because Plaintiffs Have No Actual Injury, They Are Not Entitled to An**

6                    **Award of Damages.**

7            Liquidated damages are not recoverable absent actual injury.  Under the VPPA a court

8    may award "actual damages but not less than liquidated damages in the amount of $2,500," but

9    only to "*person[s] aggrieved* by any act of a person in violation of this section."  18 U.S.C.

10   § 2710(c)(2)(A) (emphasis added).  An "aggrieved person" is one who is injured.  *See* BLACK'S

11   LAW DICTIONARY (9th ed. 2009) (aggrieved party is one "whose personal, pecuniary, or

12   property rights have been adversely affected by another person's actions").  Thus, even if a VPPA

13   violation occurred, to recover the $2,500 liquidated amount, plaintiffs must as a threshold matter

14   present proof of actual injury from Hulu's alleged conduct.  Congress could have drafted the law

15   to provide plaintiffs with monetary relief on mere proof of a violation, but Congress did not do so.

16           That is a crucial difference.  The Supreme Court has held, in interpreting a similar

17   damages provision under the Privacy Act—which allows for "actual damages sustained by the

18   individual as a result of the refusal or failure, but in no case shall a person entitled to recovery

19   receive less than the sum of $1,000," 5 U.S.C. § 552a (g)(4)(A)—that a plaintiff must have proof

20   of actual damages to obtain that liquidated amount:

21           That is, an individual subjected to an adverse effect has injury enough to open the
             courthouse door, but without more has no cause of action for damages under the
22           Privacy Act
             ....
23           [Plaintiff] suggests there is something peculiar in offering some guaranteed
             damages, as a form of presumed damages not requiring proof of amount, only to
24           those plaintiffs who can demonstrate actual damages.  But this approach parallels
             another remedial scheme that the drafters of the Privacy Act would probably have
25           known about.  At common law, certain defamation torts were redressed by general
             damages but only when a plaintiff first proved some "special harm," i.e., "harm of
26           a material and generally of a pecuniary nature." [citations.]  Plaintiffs claiming
             such torts could recover presumed damages only if they could demonstrate some
27           actual, quantifiable pecuniary loss.  Because the recovery of presumed damages in
             these cases was supplemental to compensation for specific harm, it was hardly
28           unprecedented for Congress to make a guaranteed minimum contingent upon some

                                               18

1    <u>showing of actual damages, thereby avoiding giveaways to plaintiffs with nothing</u>
<u>more than "abstract injuries."</u>

2

3    *Doe v. Chao*, 540 U.S. 614, 624-26 (2004) (emphasis added).[4]

4        Thus, even if the VPPA's liquidated damages provision affords plaintiffs with standing to

5 sue, they must show actual injury to recover damages. *See generally Vill. of Arlington Heights v.*

6 *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977) ("The plaintiff must show that he himself is

7 injured by the challenged action of the defendant"). Plaintiffs have not sustained an injury.

8        Hulu propounded interrogatories asking each plaintiff to describe the nature and amount

9 of any damage or injury they claim to have suffered as a result of Hulu's alleged violation of the

10 VPPA. Each plaintiff responded: "Plaintiff seeks statutory damages under VPPA. Plaintiff

11 suffered harm in that his privacy rights were violated," and three plaintiffs added "and because he

12 paid for Hulu's premium services." (*See* Robison Decl., ¶¶ 4-8, Exs. A-E, Responses to

13 Interrogatory No. 6.) That is not a description of any actual injury resulting from the alleged

14 disclosure of PII, much less evidence of any such injury. Instead of providing facts that describe

15 an alleged injury, the responses advance a legal argument that a disclosure under the VPPA is

16 itself an injury that entitles plaintiffs to a liquidated sum. Allowing for recovery under such

17 circumstances would override the statute's express language and eliminate any injury

18 requirement. And, contrary to the Supreme Court's reasoning in *Chao*, it would mean that

19 Congress passed the VPPA to provide "giveaways" to plaintiffs with nothing more than

20 "abstract" injuries. 540 U.S. at 626. In the absence of evidence of injury, Hulu is entitled to

21 summary judgment. *See In re Online DVD Rental Antitrust Litig.*, No. M09-2029, 2011 WL

22 5883772 (N.D. Cal. Nov. 23, 2011) (granting summary judgment, because, *inter alia*, plaintiffs

23 could not show an injury-in-fact).

24    _____

[4] Relying on *Chao*, the Seventh Circuit held that actual damages were required for a recovery of
25 liquidated damages under subsection (e) of the VPPA, the statute's "retention" claim. *Sterk v.*
*Redbox Automated Retail, LLC*, 672 F.3d 535, 538-39 (7th Cir. 2012). *Sterk* includes dicta to the
26 effect that recovery under subsection (b) of the VPPA may not require a showing of actual
damages because the court likened disclosure of PII to "an unlawful appropriation of private
27 personal information." *Id.* at 539. However, that is inconsistent with the Supreme Court's
discussion in *Chao* of the comparable provision in the Privacy Act and of common law torts,
28 noted above. Moreover, unless plaintiffs can show that Hulu disclosed their PII, that out-of-
circuit dicta would not even apply.

   HULU'S MOTION FOR SUMMARY JUDGMENT
NO. 4:11-CV-03764 LB

1  **V.      CONCLUSION**

2          For the foregoing reasons the Court should grant summary judgment for Hulu.

3  Dated: July 15, 2013                              Respectfully submitted,

4                                                     ROBERT M. SCHWARTZ
                                                      KATHERINE M. ROBISON
5                                                     STEVEN M. DUNST
                                                      O'MELVENY & MYERS LLP
6

7                                                     By: _/s/ Robert M. Schwartz_____
                                                           Robert M. Schwartz
8                                                     Attorneys for Defendant Hulu, LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HULU'S MOTION FOR SUMMARY JUDGMENT
                                                   NO. 4:11-CV-03764 LB